# EXHIBIT G



Writer's Direct Dial: 610-822-2209
E-Mail: ezagar@ktmc.com
*Please reply to the Radnor Office*

May 25, 2017

**VIA FEDEX**
Kevin A. Plank
Chairman of the Board of Directors
Under Armour, Inc.
1020 Hull Street
Baltimore, MD 21230

A.B. Krongard
Lead Independent Director
Under Armour, Inc.
1020 Hull Street
Baltimore, MD 21230

Re:   *Shareholder Demand*

Dear Messrs. Plank and Krongard:

The undersigned represents Dr. Scott King (the "Stockholder"), a holder of 22.3647 shares of Class C common stock and 28.5359 shares of Class A common stock of Under Armour, Inc. ("Under Armour" or the "Company"). I write on behalf of the Stockholder to demand that the Board of Directors of Under Armour (the "Board") take action to remedy (a) breaches of duties by the directors of Under Armour; (b) the unjust enrichment of the Company's controlling stockholder and his affiliates; and (c) the usurpation of a corporate opportunity belonging to Under Armour, as described herein.

As you are aware, by reason of their positions as directors of the Company and because of their ability to control its business and corporate affairs, Under Armour's directors owe the Company and its stockholders duties of loyalty, good faith, due care and candor. The Stockholder believes that the following current directors of the Company violated these core principles, causing the Company to suffer damages: founder, Chairman and Chief Executive Officer ("CEO") Kevin A. Plank ("Plank"); directors and members of the Audit Committee of the Board of Directors (the "Audit Committee") Douglas E. Coltharp, Anthony W. Deering and A.B. Krongard; and directors Byron K. Adams, Jr., George W. Bodenheimer, Karen W. Katz, William R. McDermott, Eric T. Olson and Harvey L. Sanders (collectively, the "Directors").

Plank is the Company's controlling stockholder, beneficially owning a total of 65.1% of the total voting power of all outstanding shares of Under Armour stock, and has the ability to control the election of directors and veto fundamental corporate transactions. Additionally, in his personal capacity, Plank owns Sagamore Development Co. ("Sagamore"), a Baltimore-based real estate development company.

280 King of Prussia Road, Radnor, Pennsylvania 19087   T. 610-667-7706   F. 610-667-7056   info@ktmc.com
One Sansome Street, Suite 1850, San Francisco, California 94104   T. 415-400-3000   F. 415-400-3001   info@ktmc.com
WWW.KTMC.COM



Kevin A. Plank
A.B. Krongard
May 25, 2017
Page 2



As early as 2008, Under Armour projected that it would outgrow its then-current headquarters in or around 2013 and would need to relocate.[1] Armed with this inside knowledge, Plank devised a plan to acquire a substantial amount of real estate in Baltimore, some of which he could subsequently sell to Under Armour, and some of which he could retain as an immensely lucrative investment. For example, the *Baltimore Sun* detailed how Plank personally – and not in his capacity as an Under Armour representative – explored areas of the city for Under Armour's future headquarters, as follows:

> Kevin [Plank] called me out of the blue, and said, "Marc [Weller, President of Sagamore], I'd really like to talk with you about the future of Under Armour."
>
> Eager to stay in Baltimore, Under Armour officials printed out aerial maps of the city to look for open space.
>
> "It became incredibly obvious Port Covington was ripe for development," Weller said.[2]

Once the "incredibly obvious" Port Covington section of Baltimore was identified as "ripe for development," Plank sought to obscure his purchases of real estate therein through the use of shell companies with generic names such as "300 East Covington." As reported by the *Washington Post*, "to make the plan work, [Plank] needed to move quickly and quietly, the developers said. … 'The use of names and addresses that didn't tie back to Kevin [Plank] was all very intentional,' Weller said. 'We wanted to be successful in acquiring as much as possible as quickly as possible.'"[3]

The bulk of Sagamore/Plank's secret Port Covington real estate purchases occurred between 2012 and 2014. As detailed in the *Baltimore Sun*, "[a] large waterfront parcel in Port Covington sold for $2 million in 2012 to an investor who declined to identify himself. Then a second large property sold nearby. Then a third. Each time, the investor's identity was hidden behind hard-to-trace limited liability corporations."[4] The article further reported:

---

[1] *See* Luke Broadwater and Natalie Sherman, *Quiet Start, Noisy Debate*, BALT. SUN, Sept. 18, 2016, at A1 ("[i]n 2008, the company projected that it would outgrow its Tide Point headquarters in about five years.").

[2] *Id. See also* Jonathan O'Connell, *When the Titan Wants to Build the Town: Under Armour Founder Kevin Plank's $5.5 Billion Plan for Baltimore*, WASH. POST, July 29, 2016, available at https://www.washingtonpost.com/news/digger/wp/2016/07/29/when-the-titan-wants-to-build-the-town-under-armour-founder-kevin-planks-5-5-billion-plan-for-baltimore/?utm_term=.ecc903f845a1 (last accessed May 25, 2017).

[3] Broadwater & Sherman, *supra* note 1.

[4] *Id.*



Kevin A. Plank
A.B. Krongard
May 25, 2017
Page 3



Companies discreetly owned by Plank purchased his first Port Covington property at a foreclosure auction. A Plank-owned whiskey distillery is now under construction on that site. His second purchase, 101 W. Dickman St., reopened last year as the City Garage incubator and event space. The third, a roughly $35 million deal revealed in January 2014 that included a Walmart and a former Sam's Club building, made it clear that someone was assembling property in the area.

Later that year, a Plank entity bought a 60-acre property there that includes the site of The Baltimore Sun's printing plant from the newspaper's former parent, Tribune Media, for $46.5 million, more than twice the $21 million it was valued for tax purposes.

Not until March 2015 was it disclosed that the anonymous Port Covington real estate purchaser was Sagamore, the real estate acquisition and development company owned and controlled by Plank.[5] Not long thereafter, Plank announced that Under Armour would relocate its corporate headquarters to Port Covington.[6]

The obvious problem with Plank's grandiose plans and announcement for Under Armour's new campus and headquarters location was that Under Armour did not own the land necessary for such a move and development – Sagamore and Plank did.

---

[5] *See e.g.*, Natalie Sherman, *Under Armour Sees Port Covington as Space to Grow*, BALT. SUN, March 3, 2015, at A1 [hereinafter Sherman, *Under Armour Sees Port Covington as Space to Grow*] ("Plank's first public comments on his ambitions for the South Baltimore peninsula came Monday [March 2, 2015] as several smaller projects get underway."); Broadwater & Sherman, *supra* note 1 ("Four years later, legal entities connected to Under Armour CEO Kevin Plank have spent more than $114 million to purchase more than 150 acres on a partially vacant peninsula jutting into the trash-filled Patapsco River's Middle Branch.").

[6] *See e.g.*, Kevin Litton, *Kevin Plank Unveils Vision for Port Covington – and It Includes Under Armour's Future HQ*, BALT. BUS. J., Mar. 2, 2015 (updated Apr. 20, 2015) ("Under Armour Inc. CEO **Kevin Plank on Monday outlined a broad vision for the land he's been acquiring in South Baltimore**, much of which will become a new campus for the sportswear maker as it outgrows its Tide Point headquarters. It was the first time Plank has spoken publicly — or even acknowledged directly — acquiring more than 128 acres of land at Port Covington he's been assembling for a real estate project of massive proportions.") (emphasis added); Sherman, *Under Armour Sees Port Covington as Space to Grow*, *supra* note 5 ("Under Armour CEO Kevin Plank said Monday that he wants to create a new neighborhood on the waterfront acreage he has assembled in Port Covington, anchored by a relocated Under Armour headquarters and enlivened by shopping, restaurants, a distillery and horse stables."); Broadwater & Sherman, *supra* note 1 ("Plank's Sagamore Development Co. has come out of the shadows and launched an unprecedented campaign, pushing for a $5.5 billion redevelopment, home of a new headquarters campus for the nation's No. 2 sports apparel company.").



Kevin A. Plank
A.B. Krongard
May 25, 2017
Page 4



Plank thereafter caused Under Armour to purchase for **$70.3 million** a portion of his personally-owned and controlled Port Covington real estate, on which the Company now plans to build its new headquarters. As reported by the *Baltimore Sun*, "**Under Armour has purchased the land in Port Covington where it plans to build its new headquarters for $70.3 million - more than twice what CEO Kevin Plank's private real estate firm paid in 2014, according to land records**."[7] Recent public filings by Under Armour confirm that the Company has spent $70.3 million – thus far – to purchase a subsection of Sagamore/Plank's Port Covington-controlled real estate to use for the Company's new campus and headquarters location. For example, the Company's Form 10-K, filed with the SEC on February 23, 2017, confirmed that:

> In June 2016, the Company purchased parcels of land from an entity controlled by the Company's CEO, to be utilized to expand the Company's corporate headquarters to accommodate its growth needs. The purchase price for these parcels totaled $70.3 million.

\* \* \*

> In 2016, we purchased buildings and parcels of land, including approximately 58 acres of land and 130 thousand square feet of office space, to be utilized to expand our corporate headquarters to accommodate our growth needs.

On April 13, 2017, Under Armour filed a definitive proxy statement with the SEC. Therein, the Company discussed the acquisition of the Port Covington real estate from Sagamore/Plank, as well as the Audit Committee's purported process for approval of the transaction, as follows:

> The location and size of the undeveloped parcels in close proximity to our current corporate headquarters provided us with a unique opportunity to develop a global headquarters suited to our needs and corporate culture. . . . In June 2016 we entered into a Purchase Agreement with entities controlled by Mr. Plank to acquire these parcels for a purchase price of $70.3 million.

Additionally, the Company's April 13, 2017 definitive proxy statement discussed and described the Board's "Policies and Procedures for Review and Approval of Transactions with Related Persons" as follows:

> Our Corporate Governance Guidelines require that any transaction involving Under Armour and a director or executive officer or entities controlled by a director or executive officer, be approved by our Board of Directors. The Board has delegated to the Audit Committee oversight and approval of these and other matters that may present conflicts of interest. The committee has adopted a formal

---

[7] Natalie Sherman, *Under Armour Buys*, BALT. SUN, JULY 19, 2016, at C1 [hereinafter Sherman, *Under Armour Buys*] (emphasis added).

Kevin A. Plank
A.B. Krongard
May 25, 2017
Page 5



written policy on transactions with related persons. Related persons are generally defined under SEC rules as our directors, executive officers, or stockholders owning at least five percent of our outstanding shares, or immediate family members of any of the foregoing. The policy provides that the committee shall review and approve or ratify transactions with related persons and any material changes to such transactions. The policy further provides that in determining whether to approve or ratify such a transaction, the committee may consider the following factors:

- whether the terms of the transaction are reasonable and fair to Under Armour and on the same basis as would apply if the transaction did not involve a related person;

- whether the transaction would impair the independence of a non-management director; and

- whether the transaction would present an improper conflict of interest, taking into account the size of the transaction, the materiality of a related person's direct or indirect interest in the transaction, and any other factors the committee deems relevant.

In addition to his concerns about Under Armour's $70.3 million purchase of real estate from Sagamore/Plank, the Stockholder is also concerned about other related-party transactions that Plank has thrust upon the Company. For example, *The Wall Street Journal* recently highlighted Under Armour's frequent related-party transactions:

> Michelle Leder, editor and founder of Footnoted, a website which tracks securities filings by publicly traded companies, said such transactions in some cases could indicate that a company's board of directors has become "complacent" with regard to management.
>
> "You see real estate, you see planes, and you ask, 'is this really an arm's-length deal?'" she said. "I tend to look the other way if it's a couple hundred thousand dollars here or there, but if it's multiple deals amounting to millions of dollars, I take a closer look."[8]

---

[8] Sara Germano, *Under Armour Paid $73 Million to CEO's Businesses*, WALL ST. J., April 14, 2017, available at https://www.wsj.com/articles/under-armour-chief-made-more-selling-it-property-than-as-an-executive-1492167600 (last accessed May 25, 2017) ("Under Armour also leased a helicopter, for $6,500 an hour, owned by one of Mr. Plank's private businesses. In all, Under Armour spent $2.4 million on aircraft, including a private jet, owned by Mr. Plank's businesses in 2016.").



As detailed in the Company's Form 10-K, filed with the SEC on February 23, 2017, Under Armour "has an operating lease agreement with an entity controlled by the Company's CEO to lease an aircraft for business purposes. The Company paid $2.0 million, $2.0 million, and $1.8 million in lease payments to the entity for its use of the aircraft during the years ended December 31, 2016, 2015 and 2014, respectively." Similarly, the Company provided additional details in its April 13, 2017 definitive proxy statement about certain transactions between Under Armour and Plank (or entities controlled by him) concerning the leasing of industrial space, payments to Plank-controlled entities for the use of a jet aircraft and a helicopter when they are "used by Mr. Plank or other persons for our business purposes," and a new 2017 agreement concerning the Company's utilization of a new hotel opened by Plank.

As a result of the related-party transactions detailed above, including the Company's $70.3 million purchase of the Port Covington real estate for its new headquarters, Plank has been unjustly enriched at the expense of the Company and its minority stockholders. In addition to the profit that Plank has already received by causing Under Armour to relocate its headquarters to Port Covington and to purchase real estate from Sagamore/Plank at a cost reported to be twice what Sagamore paid for that land, Plank stands to receive substantial additional profits in the form of (a) the increased property value of the Port Covington real estate holdings that Sagamore/Plank have not sold to Under Armour and (b) the receipt of additional remuneration as Sagamore/Plank's other Port Covington property is sold or developed.

Indeed, since publicly announcing that Under Armour will relocate its headquarters to Port Covington, Plank and Sagamore have been working on a multi-billion dollar development of the land adjacent to Under Armour's new campus location. As reported by the *Baltimore Sun*, "[o]ver the next two decades, the ambitious plan would remake the area with offices, homes, shopping, restaurants, waterfront parks and a new state-of-the-art campus for Under Armour."[9] Another *Baltimore Sun* article reported that Sagamore/Plank intend to make additional sales of land in the Port Covington area to "partners," and detailed the substantial profit that Sagamore/Plank will receive from those additional land sales, as follows:

> Sagamore, which amassed about 160 acres there over several years, has said it plans to sell land to partners to redevelop the area, which is south of Interstate 95 on the Patapsco River's Middle Branch.

\* \* \*

> **Sagamore is expected to make $400 million** from land sales during the multi-decade project, according to an analysis conducted for the city.[10]

---

[9] Adam Marton, Natalie Sherman & Caroline Pate, *Port Covington Redevelopment Examined*, BALT. SUN, available at http://data.baltimoresun.com/news/port-covington/ (last accessed May 25, 2017).

[10] Sherman, *Under Armour Buys*, supra note 7 (emphasis added).

Kevin A. Plank
A.B. Krongard
May 25, 2017
Page 7



Thus, the Company's decision to acquire the parcels from Sagamore/Plank not only enriched Plank through an excessive purchase price, it also significantly bolstered the value of Plank's other Port Covington investments.

Each of the Directors owed the Company the duties of loyalty and good faith. Those duties required the Directors to place the interests of Under Armour and its public stockholders above their own interests and those of Under Armour's controlling stockholder (*i.e.*, Plank).

Plank, aided and abetted by Sagamore, breached his duties to the Company by, *inter alia*, (a) exploiting confidential Company information (*i.e.*, the Company's need to move its headquarters and likely move to Port Covington) for his own gain; (b) usurping a corporate opportunity from Under Armour to purchase and develop land for the Company's future campus and headquarters location; (c) driving up the price of the land in Port Covington that he would subsequently cause the Company to buy; (d) causing the Company to buy the land in Port Covington from Sagamore/Plank at an excessive price; and (e) causing the Company to enter into a number of other unfair related-party transactions with Plank's personally-owned entities. Additionally, Plank and Sagamore have been unjustly enriched through this scheme. Despite its role as the centerpiece of a multi-billion dollar development project, Under Armour will receive none of the economic benefits that Sagamore/Plank will enjoy.

The Directors other than Plank also breached their duties to the Company by, *inter alia*, (a) approving the purchase of the land in Port Covington from Sagamore/Plank at an inflated price and (b) approving a myriad of other unfair related-party transactions designed to unfairly benefit Plank.

On behalf of the Stockholder, I hereby demand that the Board take action against each of the Directors and Sagamore to recover the damages described herein for the benefit of the Company, and correct the deficiencies in the Company's corporate governance that allowed the misconduct described herein to occur. If within a reasonable period after receipt of this letter the Board has not taken the action demanded herein, or in the event the Board refuses to take the action demanded herein, the Stockholder intends to commence a stockholder derivative action on behalf of the Company seeking appropriate relief.

Very truly yours,

KESSLER TOPAZ
MELTZER & CHECK, LLP

Eric L. Zagar

ELZ/sk

cc: Jeremy S. Friedman, Esq.

